**MARTIN TEXAS ENERGY COMPANY,**
**Plaintiff–Appellant,**

v.

**WASHINGTON GAS LIGHT COMPANY,**
**et al., Defendants–Appellees.**

No. 87–3650.

United States Court of Appeals,
Fifth Circuit.

Dec. 22, 1989.

Rehearing Denied Jan. 22, 1990.

Regel L. Bisso, New Orleans, La., for plaintiff-appellant.

Gary A. Bezet and G. William Jarman, Baton Rouge, La., for Transcontinental.

Earl H. Willis, St. Martinville, La., Roberta Willis Sims and Kevin J. Baldwin, Washington, D.C., for Washington Gas.

Before KING and DUHÉ, Circuit Judges, and BIGGERS, District Judge.[1]

DUHÉ, Circuit Judge.

Martin Texas Energy Company (Martin Texas) sued Transcontinental Gas Pipeline Corporation (Transco) for intentional interference with a contract and Washington Gas Light Company (Washington) and two subsidiaries for breach of contract. After a bench trial the district judge denied all relief and Martin Texas appeals. We affirm. The clearly erroneous standard of review applies. Fed.R.Civ.P. 52(a).

On September 26, 1984 Ken Martin of Martin Texas and Frank Hollewa of Washington negotiated a contract for the sale of natural gas. The contract provided for Washington to buy 20,000 MMBtu (million British thermal units) per day and an additional 45,000 MMBtu if both parties agreed. The contract recited a price of $3.15 per MMBtu, but the parties agreed to a price of $3.10 for deliveries in October.[2] The gas would be transported by Transco, Columbia Gas Transmission Corporation (Columbia), or any other mutually agreeable transporter, and the contract would continue in ef-

fect for one year after the first delivery. Paragraph seven provides:

> Buyer's obligation to buy Seller's gas pursuant to this Agreement is expressly made subject (1) to the availability of capacity in Transporter's pipeline system to accept the gas available from Seller's gas supply, (2) to Transporter's willingness to transport such gas for the account of Buyer, and (3) to Columbia Gas Transmission Corporation's right to match the terms and conditions of Martin Texas Energy Company's offer to sell gas hereunder with one of its on-system producers. In such latter event, Buyer shall have the right to cancel this Agreement as of November 1, 1984, by furnishing 10 days written notice to Seller. The obligations of Seller and Buyer with respect to the sale and purchase of gas hereunder shall be suspended during periods Transporter is unable or unwilling to transport such gas for Buyer, and this Agreement shall terminate in the event the transportation arrangements between Buyer and Transporter of Seller's gas are terminated.

Columbia maintained a "right of first refusal" policy to benefit its on-system producers.[3] Before it transported gas from someone other than an on-system producer it asked the local distribution company (LDC) to inform it of the essential terms of the contract to be "matched." Columbia then informed its on-system producers of those terms and referred interested producers to the LDC for possible negotiation of a contract.

A transportation agreement between Columbia and Washington reflected Columbia's right of first refusal policy. If Washington requested Columbia to transport gas from a non-Columbia producer, the transportation agreement required Washington to purchase from a Columbia producer

---

1. District Judge, Northern District of Mississippi, sitting by designation.

2. Hollewa testified that the discrepancy in price anticipated transportation on Columbia beginning November 1, when the Columbia rates would be lowered.

3. Columbia's on-system producers were those producers who made a long-term dedication of gas to Columbia and were ordinarily preempted from offering their gas to another pipeline.

whenever that producer offered terms as favorable as those offered by the non-Columbia producer. Accordingly, while the Washington/Martin Texas contract was under discussion Hollewa contacted George Shriver of Columbia regarding potential matches for the proposed contract. Shriver informed Hollewa by letter that Columbia might have on-system producers who could match Martin Texas' offer, and that under Columbia's right of first refusal policy Columbia was obliged to give its on-system producers a first opportunity to match. Shriver requested Hollewa to provide him with several details of the proposed contract to enable Columbia to fashion an offer to its on-system producers. Martin reviewed Shriver's letter during the negotiations and made the notation "We should avoid tendering gas here [i.e., at a Columbia delivery point]" on the letter. The contract was executed a few days later.

Shriver testified that Columbia's right of first refusal policy applied only when Columbia provided the transportation. Shriver believed, based on the September 26 communications with Washington, that Columbia would begin transporting gas for Washington on November 1. He informed Columbia's on-system producers of the essential terms of the proposed Washington/Martin Texas contract, and Exxon Corporation and Delhi Gas Pipeline Corporation (Delhi), an intrastate pipeline, indicated their willingness to match the contract. Exxon was also willing to provide Columbia with take or pay relief,[4] and Texas Oil and Gas Corporation (TXO), Delhi's parent company, was willing to provide take or pay relief on Delhi's behalf.

On September 27 Martin negotiated a contract with Energy Marketing Exchange (EME), a supplier of natural gas, to sell 20,000 MMBtu of natural gas per day to Martin Texas and additional amounts at Martin Texas' request. The EME contract largely mirrored the Washington contract, except that Martin inserted the following provision:

WHEREAS, to the extent reasonably possible all gas delivered hereunder to the delivery point(s) ... shall be on a "no-name" basis or such other basis that will shield the identity of Seller from LDC [i.e., Washington], said shielding being the intent of the parties hereto.

The Washington/Martin Texas contract recited October 1 as the effective date. The EME/Martin Texas contract, however, was not executed until October 4 and Martin Texas did not have gas available to deliver to Washington by October 1. Washington agreed to take deliveries from Martin Texas beginning October 8 and purchased from Good Hope Refineries (GHR) in the interval. On October 8 Martin Texas began selling to Washington the gas purchased from EME.

The procedure for delivery of gas required Washington to notify the transporter each month that it was requesting transportation and to list the sources and quantities to be delivered. The transporter then prepared a "kick-off sheet" setting forth the name of the supplier, the points of receipt and delivery, and all necessary authorizations. Washington was also required to contact the dispatch department for the transporter each morning and confirm the nomination of gas for that day.

Washington nominated gas from Martin Texas on a Transco pipeline from October 8 to 10. On October 10 Transco told a Washington dispatcher that Transco was having difficulty identifying the delivery of Martin Texas gas to the pipeline. Hollewa testified that he was told Transco would terminate Washington's right to nominate if the identification problem were not corrected. Hollewa called Bill Barrett of Transco, who confirmed the identification problem and also informed Hollewa that EME was Martin Texas' supplier. Barrett described the resale of EME gas as part of a "daisy chain" which he believed was a bad business practice. Martin Texas would therefore be removed from the kick-off sheet,

---

4. Columbia had agreed with its on-system producers to take a certain amount of gas per month or pay a particular sum to the producer. In July of 1983 it agreed with its producers to transport certain gas supplies on the condition that such gas would reduce the onus of its "take or pay" obligations.

and Barrett suggested Hollewa purchase gas from a certain Transco subsidiary. Hollewa decided instead to substitute GHR in view of the fact that Washington had previously used GHR to cover for Martin Texas. Hollewa testified that the fact it had paid only $3.00 per MMBtu to GHR had nothing to do with his decision.

Carl Rogers, Transco's senior gas controller, testified regarding the difficulty in identifying Martin Texas' gas. He stated that on October 8 he spoke with operators at the two receipt points who told him they had never heard of Martin Texas. He was unsuccessful in identifying the gas during the next two days and directed a Transco gas controller to tell Washington that deliveries would stop. Rogers stated that after three days of gas deliveries to Washington the Transco system was out of balance in an amount corresponding to those deliveries.[5] He also stated that on October 1 he was contacted by Tim Hale of EME, who asked Rogers to permit EME to supply gas to Washington in Martin Texas' stead. Rogers told Hale that such a transaction was not permitted, since Transco required a kick-off sheet with EME identified as the source.

Lawrence Seaton, Transco's senior marketing representative, testified that he received a telephone call from Ted Holliday of EME around October 10. Holliday asked Seaton to transport EME gas to Washington on Martin Texas' behalf, but not to inform Washington that the gas originated from EME. Seaton believed it was unethical to perform what Holliday requested, and he told Holliday that Transco would not transport gas to Washington unless Transco were permitted to disclose the source in the event Washington should ask. Seaton informed Barrett of the telephone call, and Barrett confirmed that Transco could not do what Holliday requested.

On October 16 Transco conducted a meeting for its customers in Washington, D.C. Hollewa, Barrett, and John Esslinger, Transco's vice president of marketing, discussed the problems in transporting the Martin Texas gas. Hollewa testified that he attempted to persuade Esslinger that Washington wished to honor its contract with Martin Texas, but that Esslinger said the transaction did not make good business sense. Esslinger testified that Washington was a valued customer of Transco, but that he did not want to be held to a "secrecy arrangement" with EME.

At about this time Hollewa spoke with Dick Saunders of Delhi regarding a possible match for the Washington/Martin Texas contract. The conversation culminated in what Hollewa described as a "verbal agreement," but Washington did not submit a written proposal to Saunders until October 22. In an October 25 letter Saunders told Hollewa that the proposal required modification, because it was drafted for purchases from a producer rather than from an intrastate pipeline.[6] With the appropriate regulatory modifications the contract went into effect on November 1. It provided for the sale of 20,000 MMBtu per day with a price set at the lesser of the maximum rate permissible[7] or $3.05 per MMBtu. The contract originally provided for a one-year term and the sale of an additional 50,000 MMBtu per day on a best efforts basis, but was amended to provide for a month-to-month term and best efforts gas of 30,000 MMBtu per day.

Washington was responsible for determining whether an offer from a Columbia on-system producer matched the terms and conditions of the Washington/Martin Texas contract. Hollewa testified that by October 19, after the verbal agreement with Delhi, he believed he had a match for the Washington/Martin Texas contract. Accordingly, he instructed Washington's assistant general counsel to inform Martin Texas that the contract would terminate.

---

**5.** Rogers explained that "out of balance" meant Transco was delivering gas at one end of the pipeline but not receiving the corresponding amount of gas at the receipt points.

**6.** Sales of natural gas by intrastate pipelines to LDCs are specially regulated under 18 C.F.R. pt. 284, Subch. D.

**7.** *See supra* note 6.

The termination letter is dated October 19 and states:

> Pursuant to section 7 of the Gas Purchase Agreement, dated October 1, 1984, between Washington Gas Light Company and Martin Texas Energy Company, this is to advise you that Columbia has exercised its right to match. Accordingly, the Agreement is no longer in effect.

Hollewa testified that, although the letter appeared to terminate the contract immediately, it was intended to provide the 10–day notice for termination on November 1.

### Tortious Interference

Martin Texas contends that Transco wrongfully interfered with Martin Texas' contract with Washington by refusing to transport gas after October 10.[8] The district court concluded that from October 11 to 16 Transco was justified in refusing to transport the Martin Texas gas because it was requested to withhold information from Washington and believed this was a bad business practice. The court believed, however, that after the meeting in Washington, D.C., Transco was not so clearly justified in its refusal. The court nevertheless concluded that Martin Texas had not sustained its burden of proving that, from that point onwards, Transco's acts were a proximate cause of Martin Texas' damages. Martin Texas had decided not to tender gas at a Columbia delivery point during October and, although this might have been a wise business decision, the court believed it constituted the "non-use of a viable alternative" and precluded a finding of proximate cause. The court also stated that there appeared to be a "good old boy" relationship between Washington and Transco, but that the evidence did not indicate these parties in any way conspired against Martin Texas.

Martin Texas first challenges the district court's conclusion that Transco was justified in refusing to transport Martin Texas' gas. Martin Texas argues that under the current law justification is an affirmative defense and the court erroneously put the burden on Martin Texas. It also argues that the finding of justification was clearly erroneous. Transco admits that Texas law regarding burden of proof on this issue has changed since this appeal was taken, but argues that the court below simply found Transco justified in refusing to transport gas without basing its ruling on any misapplied burden of proof.

The theory of legal justification permits a person to interfere with another's contract if the interference is in the bona fide exercise of his own rights or if he has an equal or superior right in the subject matter to that of the other party. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 691 (Tex.1989). In 1984 the Texas Supreme Court stated that legal justification was an element of the plaintiff's case. *Sakowitz, Inc. v. Steck*, 669 S.W.2d 105, 107 (Tex.1984). In 1989, after the decision of the district court in the present case, the Court overruled *Sakowitz* and stated squarely that legal justification should be treated as an affirmative defense. *Sterner*, 767 S.W.2d at 690.

The change in Texas law has no effect on the resolution of this appeal. It is true, as Martin Texas states, that the district judge quoted a statement of the prior law in *Hi–Line Elec. Co. v. Dowco Elec. Prods.*, 765 F.2d 1359, 1362 (5th Cir.1985) and cited a case that was subsequently expressly overruled in *Sterner*. But the judge's finding nowhere indicates that he misapplied the burden of proof. He states:

> Transco was justified in failing to transport the Martin gas from October 11, 1984 through October 16, 1984 by reason of the improper business procedure by way of which Transco was requested to withhold information from Washington. Transco was essentially justified in its notion that to withhold information from Washington constituted a bad business practice, one in which they were unwilling to indulge, (and one which could,

---

**8.** Neither party challenges the district court's determination that Texas law applies to this claim.

perhaps, form the basis for a continuing unwillingness to do business.)

It appears that the judge simply found justification based upon all the evidence without regard to the placement of the burden of proof. This is confirmed by the fact that, notwithstanding the law prevailing at the time, Martin Texas did not allege want of justification in its complaint and Transco specifically pleaded it as an affirmative defense. *Sterner*, therefore, could not have altered the judge's finding of justification.

To support its argument that Transco was not justified in interfering in the Washington/Martin Texas contract Martin Texas recites certain facts showing that Transco had a financial incentive to terminate the deliveries. It points out that shortly after Transco terminated the deliveries Barrett specifically recommended that Hollewa substitute the gas of a Transco subsidiary. It also points out that during October 1984 Transco received take or pay relief for all gas sold by GHR to Washington and its subsidiaries, and that Transco received no such relief for transporting Martin Texas' gas.

■ Martin Texas presents a fair argument under the record that Transco misrepresented its grounds for refusing to transport its gas. The district judge saw some merit in Martin Texas' argument, finding that Washington and Transco did not always act together in such a way to protect Martin Texas' interests. But despite some evidence of bad motive on Transco's part the district judge's finding that Transco was justified in refusing to transport the gas is not clearly erroneous.[9] Rogers testified that Hale asked him to allow EME to substitute for Martin Texas without informing Washington that EME was involved in the transaction. Seaton similarly testified that Holliday asked him to transport EME gas without informing Washington. According to Hollewa and Seaton, Barrett believed that the resale of the EME gas and EME's request for secrecy were bad business practices. Esslinger testified that he did not wish to be held to a secrecy arrangement with EME. This evidence adequately supports a finding that in refusing to transport the Martin Texas gas Transco honestly objected to transporting the gas and exercised its rights in good faith.

■ Martin Texas nevertheless argues that Seaton's testimony regarding Holliday's request is hearsay. The testimony states:

Q: What did Mr. Holliday—what did he say to you, Mr. Seaton?

A: ... [H]e said he would like to have us deliver gas for Martin Energy to Washington Gas Light, but not to tell Washington Gas Light the gas is originating with EME.

The statement was not introduced for its truth. It makes no difference to the resolution of the tortious interference claim whether Holliday actually wished to have Transco withhold information from Washington. For purposes of determining whether Transco was justified in refusing to transport gas, it is important only that Transco believed EME made an improper request. The testimony is therefore not hearsay.

■ The district judge was also correct in finding that Transco's actions were not a proximate cause of Martin Texas' claimed losses. Under Texas law, a plaintiff in a tortious interference action must prove that he suffered actual damages as a proximate result of the defendant's conduct. *B. Cantrell Oil Co. v. Hino Gas Sales, Inc.*, 756 S.W.2d 781, 784 (Tex.App.—Corpus Christi 1988, no writ). Martin Texas may have been precluded from transporting on Transco after October 16, but the contract permitted gas to be transported on Transco, Columbia, or any other mutually agreeable transporter. The "right to match" in favor of Columbia's on-system producers would not go into effect until November 1. Martin Texas erroneously

9. This finding and several findings discussed below were labeled by the district court as conclusions of law.

believed it faced the possibility of a match only during October, and during that month passed over the opportunity to transport gas on a Columbia pipeline. This decision may have been based on an honest error but, as the district judge stated, it "materially weakens the basis upon which damages are sought...."

██ Martin Texas argues that, notwithstanding the alternatives under the contract, Transco's refusal to transport deprived it of one of its options and therefore warrants a finding of proximate cause. It is true that all invasions of contract relations, including any act which makes performance more burdensome, difficult, or impossible, may constitute an actionable tort of interference. *Tippett v. Hart*, 497 S.W.2d 606, 610 (Tex.Civ.App.—Amarillo 1973), *writ ref'd n.r.e. per curiam*, 501 S.W.2d 874 (Tex.1973). But this does not mean any degree of added burden to performance gives rise to an actionable tort. In the chain of events Martin Texas' lost profits were ultimately the result of Delhi's match and Martin Texas' efforts to keep secret the source of its gas. Transco's refusal to transport may have been one event in the chain, but the record does not show this alone was a proximate cause of Martin Texas' claimed damages. Transco's acts did not terminate the contract, but only suspended the delivery of gas pending Delhi's match in November. Certainly proximate cause would be clearer if Washington and Transco conspired to terminate the contract, but the district court correctly rejected that theory as unsupported in the record. The loss of a transport option during October therefore does not rise to the level of a proximate cause of the claimed damages, and the district court's finding to that effect is not clearly erroneous.

Martin Texas also contends it is entitled to recover punitive damages from Transco. Because we find Martin Texas may not prevail on its tortious interference claim, it is unnecessary to address Transco's liability for punitive damages. *Bellefonte Un-*

*derwriters Ins. Co. v. Brown*, 704 S.W.2d 742, 745 (Tex.1986).

### Breach of Contract

Martin Texas contends that Washington breached its contract by improperly substituting Delhi for Martin Texas. The district court concluded that Washington was not obligated to purchase from Martin Texas if a Columbia on-system producer matched the terms and conditions of the contract. The court noted that Delhi was not strictly an "on-system producer" of Columbia, but believed it could be treated as such since TXO, Delhi's parent company, traditionally provided take or pay relief to Columbia for Delhi gas and Columbia had historically treated Delhi as an on-system producer. The court also concluded that the Delhi contract matched the Washington/Martin Texas contract. The duration of the two contracts differed and the Delhi gas was potentially encumbered by another commitment, but Delhi's price was equal or better than Martin Texas' price and the quantities to be sold were similar.

Martin Texas first argues that the right of Columbia's on-system producers to match was applicable only during October, during which time Martin Texas tendered all of its gas to Transco. Because no right to match could arise unless Martin Texas tendered its gas to a Columbia delivery point, Washington was not entitled to assert the termination provision of paragraph seven.

██ The argument is wanting in several respects. The contract does not limit to the month of October the right of Columbia's on-system producers to match; the reverse is true. Under the language of paragraph seven Washington was permitted to take advantage of a match on or after November 1.[10] With respect to the relevance of delivery points, Martin Texas' argument misses the point that the resolution of this claim is governed by the terms of the contract and Washington's rights thereunder. There is nothing in the con-

---

10. Martin Texas' argument assumes that the October 19 letter terminated the contract immediately. As Hollewa testified, however, it is more likely that the letter was intended to provide the 10 days' notice for termination.

tract that conditions Washington's right to substitute a matching contract on the selection of a delivery point. The contract permits Washington to evade its obligation to purchase gas from Martin Texas if it receives a matching offer from a Columbia on-system producer, regardless of where either party has tendered, will tender, or customarily tenders. Admittedly, the right to match is an opportunity offered by Columbia alone and would apply only if Columbia provides the transportation. There is also evidence showing that, on the one hand, the seller is in the best position to choose the delivery point and hence the pipeline and, on the other hand, that the LDC customarily chooses the transporter. But for purposes of determining whether Washington acted within its rights under paragraph seven, the customary mechanics of delivery cannot prevail over the words of the contract.

■ Martin Texas next argues that Delhi is not a producer and is therefore not entitled to provide a matching contract. There is little doubt that Delhi is an intrastate pipeline and not a producer, but the district court was nevertheless correct in finding that, under the contract, Delhi could fairly be treated by Washington as an on-system producer. Shriver testified that under Columbia's right to match program he regularly paired customers with on-system producers, and that Delhi was among those "on-system producers" to whom he supplied information regarding potential matches. Shriver also stated that the right of first refusal policy allows Columbia to maximize its take or pay relief; under the policy Columbia had always treated Delhi as an on-system producer because TXO provided take or pay relief for all gas sold by Delhi and transported by Columbia. On the basis of this testimony it is reasonable to conclude as the district court did that under the Washington/Martin Texas contract Delhi was a suitable equivalent to an on-system producer, and

the district judge's finding to that effect is not clearly erroneous.

Martin Texas next argues that the terms and conditions of the Delhi contract did not match those of the Washington/Martin Texas contract, relying on the final form of the contract that became effective on November 1. Washington argues that the Delhi contract met or surpassed its other contract, and that the terms of the oral agreement between Hollewa and Saunders, rather than the agreement's final form, should be examined to determine whether a match was present.

■ Paragraph seven does not clearly state whether Washington must have a matching contract which is final rather than preliminary, but in either event it is clear Washington acted within its rights in treating the Delhi contract as a match. The district court correctly compared price, quantity, and duration under the two contracts in concluding that a match was present. While its right of first refusal policy was in effect Columbia customarily asked the LDC intending to transport off-system gas to provide it with the following contractual information:

1) Wellhead price of gas and transporters (if any) delivering the gas to Columbia.

2) Price of gas delivered to Columbia including brokerage fees and third party transportation costs.

3) Maximum daily quantity to be transported.

4) Term of contract and total quantity of gas to be delivered.

5) Other conditions of sale which are critical to be included in the contract with the on-system producer.

Price, quantity, and duration are conspicuous among these items of information and the three criteria may be taken as an aid in defining a match.[11] Both the initial and final agreement between Washington and Delhi called for the sale of 20,000 MMBtu

11. Martin Texas erroneously contends that the five items of information constitute terms that must be identical in the two contracts in order for a match to be present. To the contrary,

Shriver testified that "It was not [Columbia's] intention in the right of first refusal to specify those items that must be identical in order for a match to occur."

per day. This is the same daily quantity [12] specified under the Washington/Martin Texas contract. The price under the Delhi contract through its several stages—$3.05 per MMBtu—was substantially better than the $3.15 per MMBtu under the Washington/Martin Texas contract. The duration of the Washington/Martin Texas contract and the initial Delhi agreement was one year. The duration of the final Delhi contract, however, was month-to-month, a clear discrepancy between the contracts.

Certainly in several important respects the contracts match point for point and viewing the contract objectively the district court was correct in finding that the two contracts match within the meaning of paragraph seven. Martin Texas correctly points out many differences between the contracts, but these differences do not seriously undermine the district court's finding. Washington clearly had some degree of discretion in determining a match; the parties stipulated that Washington was responsible for determining whether a match was present, and in view of this stipulation it is impossible narrowly to define a match purely by objective factors. Certain testimony regarding what constitutes a match demonstrates the discretion enjoyed by Washington. Shriver stated that when he telephoned Exxon and Delhi with information on the Washington/Martin Texas contract he most likely only communicated the price under that contract. This indicates that the price of the gas might be deserving of special weight in the evaluation of a possible match. Shriver also stated that a matching offer would be one in which the potential buyer received a "value" he believed was equal or better than the competing offer. Similarly, Douglas John, offered by the plaintiff as an expert in FERC regulation, testified that when examining contracts for a match it is important to take into consideration the "entire package" instead of breaking the package down into separate points. The testimony of Shriver and John support the district court's conclusion that Washington correctly determined a match was present. The numbers may not match perfectly under the two contracts, but certainly looking at the "entire package" under either the initial or final Delhi contract Washington could easily conclude it was receiving a better "value" from Delhi than from Martin Texas. Paragraph seven does not require a perfect match.

Martin Texas raises certain residual issues regarding Washington's conduct. It first contends that Washington's refusal to nominate Martin Texas' gas on and after October 11 constituted a breach of contract. It argues at length that Transco could not have learned of the claimed imbalance in the pipeline so quickly, and that Washington and Transco acted in concert to allow Washington to escape its obligations. This argument is without merit, because the contract expressly states that the obligations of the parties are suspended during periods when the transporter is unwilling to transport gas. We concluded above that during the periods in questions Transco was justified in refusing to transport and that the district court was correct in rejecting Martin Texas' conspiracy theory.

Martin Texas also argues that Washington breached both an implied promise of good faith and fair dealing as well as a provision of the contract requiring Washington to use its best efforts to insure transportation of gas. These claims were not presented to the district court, and accordingly we do not pass on them. *In re Goff*, 812 F.2d 931, 933 (5th Cir.1987).

The judgment is AFFIRMED.

---

**12.** There is a wide difference, as Martin Texas points out, between the respective quantities of gas to be purchased over the entire terms of the two contracts.